JOSH KREVITT, SBN 208552
  JKrevitt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035

WAYNE M. BARSKY, SBN 116731
  WBarsky@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East, #4000
Los Angeles, CA 90067
Telephone: 310.552.8500
Facsimile: 310.551.8741

FREDERICK S. CHUNG, SBN 183337
  FChung@gibsondunn.com
STUART M. ROSENBERG, SBN 239926
  SRosenberg@gibsondunn.com
ALISON WATKINS, SBN 253023
  AWatkins@gibsondunn.com
QUINCY LU, SBN 267249
  QLu@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone: 650.849.5300
Facsimile: 650.849.5333

Attorneys for Defendant and Counterclaimant
FITBIT, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| ALIPHCOM D/B/A JAWBONE and BODYMEDIA, INC.,<br><br>              Plaintiffs,<br><br>     v.<br><br>FITBIT, INC.,<br><br>              Defendant. | CASE NO. 3:15-cv-2579-HSG<br><br>**DEFENDANT FITBIT, INC.'S NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FED. R. CIV. P. 12(C)**<br><br>**Hearing:**<br>Date:          November 19, 2015<br>Time:          2:00 p.m.<br>Courtroom:  15, 18th Floor<br>Judge:         Hon. Haywood S. Gilliam, Jr. |

Gibson, Dunn &
Crutcher LLP

## NOTICE OF MOTION AND MOTION

**TO THIS COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

Please take notice that on November 19, 2015, at 2:00 p.m., in Courtroom 15 of the above-captioned court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as soon thereafter as may be heard, Defendant Fitbit, Inc. will, and hereby does, move this Court for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) that the claims of U.S. Patent Nos. 8,398,546, 8,446,275, and 8,793,522 are directed to ineligible subject matter under 35 U.S.C. § 101.

A finding of patent ineligibility with respect to the claims is warranted on two grounds set out in the U.S. Supreme Court's 2014 decision in *Alice Corp. Pty. Ltd. v. CLS Bank, Int'l*, 134 S. Ct. 2347 (2014).  First, each asserted claim is directed to an abstract idea, which is not eligible for patent protection under § 101.  Second, none of the asserted claims provide an inventive concept that would confer patent eligibility to such claimed abstract ideas.

Defendant's motion is based on this Notice, the attached Memorandum of Points and Authorities, the papers and pleadings on file, and on such additional arguments and materials as may be presented at or before the hearing of this matter.


Dated: October 9, 2015                        GIBSON, DUNN & CRUTCHER LLP


By:      */s/ Frederick Chung*
                 Frederick S. Chung

Attorneys for Defendant Fitbit, Inc.

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ............................................................................................................ 1

II.    BACKGROUND ............................................................................................................. 1

    A.     THE PARTIES AND THIS LAWSUIT .................................................................. 1

    B.     THE ASSERTED CLAIMS ..................................................................................... 2

        1.     U.S. Patent No. 8,398,546: Providing Weight-Loss Suggestions ..................... 2

        2.     U.S. Patent No. 8,446,275: Collecting Data To Provide Health "Scores" ........ 4

        3.     U.S. Patent No. 8,793,522: Turning A Device Off During Shipment To Save Battery Power ........................................................................................... 6

III.   ARGUMENT .................................................................................................................. 8

    A.     LEGAL STANDARDS ........................................................................................... 8

        1.     Patent Claims Directed to an Abstract Idea and Lacking Inventive Concept Are Ineligible Under 35 U.S.C. § 101 .................................................. 8

        2.     A Court Should, in the Interest of Efficiency, Grant Judgment on the Pleadings to a Defendant When the Plaintiff Asserts Ineligible Patent Claims ................................................................................................................ 9

    B.     JUDGMENT ON THE PLEADINGS SHOULD BE GRANTED BECAUSE THE ASSERTED PATENT CLAIMS ARE INELIGIBLE UNDER § 101 ............. 10

        1.     The '546 Patent ................................................................................................ 10

        2.     The '275 Patent ................................................................................................ 13

        3.     The '522 Patent ................................................................................................ 16

IV.    CONCLUSION ............................................................................................................. 19

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
 134 S. Ct. 2347 (2014) ................................................................. 8, 9, 12, 13, 15, 16, 17

*buySAFE, Inc. v. Google, Inc.*,
 765 F.3d 1350 (Fed. Cir. 2014) ........................................................................ 9

*Chavez v. United States*,
 683 F.3d 1102 (9th Cir. 2012) ......................................................................... 9

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
 776 F.3d 1343 (Fed. Cir. 2014) ......................................................... 2, 9, 12, 17

*CyberSource Corp. v. Retail Decisions, Inc.*,
 654 F.3d 1366 (Fed. Cir. 2011) ...................................................................... 11

*DDR Holdings, LLC v. Hotels.com, L.P.*,
 773 F.3d 1245 (Fed. Cir. 2014) ...................................................................... 18

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
 758 F.3d 1344 (Fed. Cir. 2014) .................................................................... 8, 13

*In re BRCA1- & BRCA2-Based Hereditary Cancer Test Patent Litig.*,
 774 F.3d 755 (Fed. Cir. 2014) ......................................................................... 9

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
 792 F.3d 1363 (Fed. Cir. 2015) ........................................................... 15, 16, 17

*Internet Patents Corp. v. Active Network, Inc.*,
 790 F.3d 1343 (Fed. Cir. 2015) ...................................................................... 14

*Mayo Collaborative Servs. v. Prometheus Laboratories, Inc.*,
 132 S.Ct. 1289 (2012) ............................................................................... 9, 16

*OIP Techs., Inc. v. Amazon.com, Inc.*,
 788 F.3d 1359 (Fed. Cir. 2015) ........................................................................ 9

*Open Text SA v. Box, Inc.*,
 78 F. Supp. 3d 1043 (N.D. Cal. 2015) ............................................................. 8

*OpenTV, Inc. v. Apple, Inc.*,
 No. 14-cv-01622-HSG, 2015 WL 1535328 (N.D. Cal. Apr. 6, 2015)............................ 12, 15, 18

*Planet Bingo, LLC v. VKGS LLC*,
 576 F. App'x 1005 (Fed. Cir. 2014) ............................................................... 16

*Shortridge v. Found. Constr. Payroll Serv., LLC*,
 2015 WL 1739256 (N.D. Cal. Apr. 14, 2015) ............................................... 9, 18

*SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*,
 718 F.2d 365 (Fed. Cir. 1983)......................................................................... 9

Gibson, Dunn &
Crutcher LLP

*Thales Visionix, Inc. v. U.S.*,
　　122 Fed. Cl. 245 (Fed. Cl. 2015) ................................................................. 11

*Ultramercial, Inc. v. Hulu, LLC*,
　　772 F.3d 709 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 2907 (2015) ................................ 9, 12, 15

*Wolf v. Capstone Photography, Inc.*,
　　2014 WL 7639820 (C.D. Cal. Oct. 28, 2014) ........................................................... 11

**Statutes**

35 U.S.C. § 101 ..............................................................................................*passim*

**Other Authorities**

*History of Technology*, ELECTROPAEDIA, available at http://www.mpoweruk.com/history.htm ........ 17

R. Goetzel *et al.*, "A Framework for Patient-Centered Health Risk Assessments,"
　　U.S. Department of Health and Human Services, Centers for Disease Control and
　　Prevention, Atlanta, GA, 2011; available at: http://www.cdc.gov/policy/opth/hra/ .................... 14

Gibson, Dunn &
Crutcher LLP

## I.       INTRODUCTION

In this case, Jawbone is asserting three patents that are directed to the abstract concepts of: (1) providing weight-loss suggestions, (2) providing health-related feedback, and (3) turning a device off to save battery power.  Specifically, U.S. Patent No. 8,398,546 claims the abstract idea of providing weight loss "suggestions" to a person, based on his or her activity levels; U.S. Patent No. 8,446,275 claims the abstract idea of collecting information about a person's health status, assigning a "score" to that status, and then presenting this score to the person in comparison to an overall "target score"; and U.S. Patent No. 8,793,522 claims the abstract idea of conserving battery power by turning off a device until a continuous power source is available.  As the patents themselves make clear, each of these abstract ideas is an age-old idea that people have been performing for many decades, without the assistance of a computer.

Moreover, none of the claims of these patents recites any inventive concept, as the claims are directed to implementing these abstract ideas on a generic computing device.  None of the claims are directed to solving a technological problem – *e.g.*, the workings of a heart rate monitor or motion sensor, or the improvement of a microprocessor in a wearable device.  Indeed, there is nothing disclosed that would make the application of these abstract ideas to a wearable computing device inventive, as opposed to any other type of computing device.  The courts have made it clear that requiring an idea to be implemented on a generic computing device is insufficient to rescue an otherwise unpatentable claim.  As a result, under 35 U.S.C. § 101 and the overwhelming weight of case law both before and after the U.S. Supreme Court's 2014 decision in *Alice Corp. v. CLS Bank*, these claims are directed to ineligible subject matter.

## II.       BACKGROUND

### A.       THE PARTIES AND THIS LAWSUIT

Defendant Fitbit, Inc. is a health and fitness company whose mission is to help people lead healthy, active lives.  Fitbit has developed critical innovations in the health and fitness market, addressing consumer needs with advanced technology embedded in cutting-edge but simple-to-use products.  Plaintiffs AliphCom d/b/a/ Jawbone and BodyMedia, Inc. (collectively, "Jawbone") are attempting to compete in the same market.  While Fitbit has achieved global success as a leading

Gibson, Dunn & Crutcher LLP

health and fitness brand, Jawbone is struggling to compete against the industry leader.  The original complaint was filed asserting three patents (including the '546 and '275 patents) on June 10, 2015.  An amended complaint asserting an additional three patents (including the '522 patent) was filed on July 3, 2015.  On July 8, 2015, Jawbone filed a complaint with the International Trade Commission under Section 337 of the Tariff Act of 1930 based on the same six patents.

**B.     THE ASSERTED CLAIMS**

**1.     U.S. Patent No. 8,398,546:  Providing Weight-Loss Suggestions**

The '546 patent issued on March 19, 2013 to Plaintiff BodyMedia, Inc.  It has a filing date of September 13, 2004 and claims priority to various provisional applications and continuation-in-part applications.  (Ex. 1.)[1]  The patent purports to set forth a "nutrition and activity management system . . . that can help an individual meet weight loss goals and achieve an optimum energy balance of calories burned versus calories consumed."  (*Id.* at 4:15-18.)  In order to achieve this, the patent describes using a wearable device that contains sensors and that can communicate with a processor to: (1) track an individual's progress toward a weight-loss goal and (2) provide "suggestions" to "achieve said weight-loss goal."  (*Id.* at 60:15-38.)  The sole independent claim, claim 1, is representative and contains the following text (left-hand column below).  A summary of each element appears in the right-hand column.

| Claim Language | Summary of Claim Element[2] |
|---|---|
| "1.  A system to provide feedback for an individual's weight-loss goal, said system comprising: | A weight-loss system that provides feedback |
| a. a wearable sensor device for detecting data; and | A wearable device with a sensor |

---

[1]  The three patents in suit are submitted as exhibits to the Declaration of Frederick Chung, filed herewith.

[2]  The short-hand summary in the table above is provided solely for ease of reading and is not intended to displace any potential construction of the claim language.  Fitbit acknowledges that on a Rule 12(c) motion for judgment on the pleadings, the claims are generally construed in a manner most favorable to the patentee.  *See, e.g.*, *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1348 (Fed. Cir. 2014).

| Claim Language | Summary of Claim Element[2] |
|---|---|
| b. a processing unit in electronic communication with said sensor device, said processing unit configured to accomplish the following steps, thus providing said feedback: | A processor that communicates with the wearable device, and: |
| (i) derive physiological and contextual data of the individual from data detected by said sensor device; | obtains information about the user and the user's environment, |
| (ii) prompt said individual to establish a weight-loss goal; | prompts the user to set a weight-loss goal, |
| (iii) generate a first suggestion to engage in an activity to assist said individual to achieve said weight-loss goal; | suggests an activity, |
| (iv) determine weight loss; | calculates weight loss, |
| (v) generate a second suggestion to engage in an activity to assist said individual to achieve said weight-loss goal if said weight-loss goal is not progressing toward the goal; | suggests an activity if progress is not being made: |
| wherein said second suggestion is based upon a determination of whether or not the individual complied with said first suggestion; and | The second suggestion is based on compliance with the first suggestion |
| wherein said determination of whether or not the individual complied with said first suggestion is based on said derived physiological and contextual data of the individual." | Compliance is based on information from the sensors. |

In short, the claimed invention is: (1) provide a suggestion on how to lose weight to achieve an individual's weight-loss goal, based on the detected activities of an individual (*e.g.*, how many steps were taken, floors climbed, or calories burned), (2) determine whether the individual is progressing toward that goal, and (3) if the individual is not making progress toward that goal, make an additional suggestion (*e.g.*, walk one more mile, climb 20 more floors, reduce intake by 300 calories).

The '546 patent includes 28 dependent claims, which are directed to specific implementations such as: determining caloric balances (claims 2-5), tracking user behavior patterns over time (claim 6), recording results (claims 7-9), storing results in a database (claims 10-13), further analyzing the results using the processor (claims 14-17), reporting results using the processor (claims 18-21), and using an "algorithm" to calculate weight loss and weight gain (claim 25). Although Jawbone has

Gibson, Dunn & Crutcher LLP

DEFENDANT FITBIT, INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS
PURSUANT TO FED. R. CIV. P. 12(C) – C-15-2579 HSG

refused to identify what claims it intends to assert in this action (*see* Joint CMC Statement, Dkt. No. 42 at 8), it has asserted all but two dependent claims (claims 19 and 29) in the ITC investigation.

### 2.     U.S. Patent No. 8,446,275:  Collecting Data To Provide Health "Scores"

The '275 patent issued on May 21, 2013 to Plaintiff AliphCom d/b/a Jawbone.  It has a filing date of April 23, 2012 and derives from a series of continuation-in-part applications (Ex. 1 at pp. 1-3), as well as four provisional applications.  The patent discloses "[g]eneral health and wellness management techniques" that include determining a user's "target score," and then comparing that score to the user's actual health status, based various health factors, including sleep, nutrition, and physical activity.  (Ex. 2 at Abstract, 35:62-67, 47:25-44 & 49:13-50:20).  Claim 1 is representative of the claimed "health and wellness management techniques."

| Claim Language | Summary of Claim Element |
|---|---|
| "1.  A method comprising: | |
| receiving data representing a profile defining parameters upon which a target score is established based on one or more health-related activities; | Receiving a profile that defines a "target score" for the user's health |
| acquiring data representing one or more subsets of acquired parameters based on one or more sensors disposed in a wearable computing device; | Sensors obtain information about the user's activities |
| determining data representing values for the one or more subsets of the acquired parameters based on reference values for the parameters set forth in the profile; | Comparing the data from the sensors with reference values |
| calculating at a first processor a score based on data representing the values, the score representing an attained portion of the one or more health-related activities; | Calculating a "score" for the user |
| causing presentation of a representation of the score relative to the target score; and | Presenting the user's score in relation to the target score |
| adjusting a determination upon which to modify the target score, | Deciding whether to change the target score |
| wherein the target score is indicative of one or more standards against which to compare one or more groups of the values aggregated to form the score." | The target score is based on certain standards |

Reduced to its fundamentals, the patented method takes detected data (*e.g.*, steps taken, hours slept, calories burned) and uses it to calculate a "score" for an individual.  It then provides feedback

to the user by presenting that score alongside a "target score" for comparison.  The method also includes a determination of whether to make changes to the target score, based on the user's activity and certain standards.

As with the '546 patent, Jawbone has refused to identify asserted claims from the '275 patent in this action, but in the ITC investigation, it has asserted dependent claims 2, 4, 5, 8, 9, 10, 13, 14, 15, and 18.  These dependent claims include additional variations, including:  calculating a score that indicates the ability of the user to "achieve a targeted level of health and wellness" (claim 2), using sleep, nutrition, or movement data (claim 4), aggregating a "sleep score," "nutrition score," and/or "activity score" (claim 5), making further adjustments to the score (claim 8), incorporating a "context score" based on external parameters (claim 9), generating a recommendation to a user to "engage . . . in a health-related activity" (claim 10), imposing more specific requirements about the information collected concerning the types and units of certain parameters (claims 13 & 14), providing feedback in the form of a specific visual interface or a vibration signal (claim 15), and reclassifying a user based on their scores (claim 18).

Finally, the '275 patent includes one independent device claim, claim 19, which takes the general concepts of the method claims and applies them to a device, wherein the "scores" are calculated using an "aggregation engine" in the device (*i.e.*, a generic processor):

| Claim Language | Summary of Claim Element |
| --- | --- |
| "19.  A device comprising: | |
| a first interface configured to receive data representing acquired parameters from one or more sensors, at least one sensor being disposed in a wearable computing device; | Information is received about a user's activities from one or more sensors on a wearable device |
| an aggregation engine comprising: | A processor that: |
| a repository configured to store data representing a profile defining parameters upon which a target score is established; and | stores a profile that defines a "target score" for the user's health |

Gibson, Dunn & Crutcher LLP

| Claim Language | Summary of Claim Element |
|---|---|
| one or more managers including one or more processors, at least one manager being configured to receive data representing a subset of the acquired parameters and further configured to determine data representing values for the subset of the acquired parameters, the values representing a point value relative to reference values for the parameters set forth in the profile; | compares the data from the sensors with reference values |
| a score generator configured to: | A score generator that: |
| calculate a score based on data representing the values; and | Calculates a score for the user |
| adjust the score based on threshold amounts for one or more of the values to form an adjusted score; | Adjusts the score based on certain settings |
| a general health and wellness module configured to facilitate modification of a value of an acquired parameter associated with a state of a user to change the target score; and | A module that allows for changes to the target score, based on the user's status |
| a status manager configured to cause presentation of a representation of the target score, wherein the score is indicative of relative proximity to the target score." | Presentation of the user's score in relation to the target score |

### 3.     U.S. Patent No. 8,793,522:  Turning A Device Off During Shipment To Save Battery Power

The '522 patent issued on June 29, 2014 to Plaintiff AliphCom d/b/a Jawbone.  It has a filing date of July 11, 2011 and claims priority to the same four provisional applications as the '275 patent. (Ex. 3.)  Jawbone has asserted just one claim from this patent in the ITC – claim 2 – which is representative and directed to the concept of managing power usage in a device by using two power modes:  either inactive with no power supplied, or active with a power supply.  More specifically, claim 2 describes the no-power "mode" as the state of the device when it is being shipped:

| Claim Language | Summary of Claim Element |
|---|---|
| "2.  A band comprising: | |
| a subset of sensors; | Sensors |
| a controller coupled to the subset of sensors; | A controller |
| an energy storage device; | A battery |

| Claim Language | Summary of Claim Element |
|---|---|
| a connector configured to receive power and control signals, the connector coupled to the energy storage device; | Connector for the battery |
| a power manager comprising: | A power manager |
| a transitory power manager configured to manage power consumption of the band during a first power mode in which no power is applied to the subset of sensors; and | Setting the band to a "first power mode" when the band is unplugged |
| a power clock controller configured to modify a clock rate of a clock signal for application to the controller as a function of a mode of operation of the band, | Modifying the speed of the controller, depending on which power mode is being used |
| wherein the transitory power manager is configured further to manage the power consumption of the band during a second power mode in which power is applied to the subset of sensors, the second power mode being subsequent to the first power mode, | Setting the band to a "second power mode" when the band is plugged into a power source |
| wherein the transitory power manager is configured to detect an application of power to the connector, and, responsive to the application of power, the transitory power manager switches the band from the first power mode to the second power mode; | Detecting when the band is plugged into a power source and then switching to the second mode |
| wherein the first power mode and the second power mode coincide with a first interval of time and a second interval of time, respectively; and | Using "first power mode" and "second power mode" at different times |
| wherein the first interval of time comprises an amount of time during which the band is shipped from a first geographic location to a second geographic location with the subset of sensors in an inoperable state and the second interval of time comprises another amount of time during which the subset of sensors in an operable state." | First power mode occurs during shipment of the device. Second power mode occurs later, when the device is in operation. |

In other words, the sole focus of claim 2 of the '522 patent is on saving battery power when a device is being shipped from the manufacturer to the retailer:  when the device is being shipped and is unplugged, the device uses reduced battery power; then, when it is plugged into an external power source, the device "wakes up" and uses more battery power.  The remaining claims are directed to variations on the same theme, with a "first power mode" (unplugged) and a "second power mode" (plugged).  For example, some of the other claims also describe "coupling" and decoupling a battery from the sensors in the two modes in order to save power.  (*E.g.*, Ex. 3, claims 3-5.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III.    ARGUMENT

**A.    LEGAL STANDARDS**

**1.    Patent Claims Directed To An Abstract Idea And Lacking Any Inventive Concept Are Ineligible Under 35 U.S.C. § 101**

Section 101 of the Patent Act, which defines the subject matter eligible for patent protection, provides that "whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor." 35 U.S.C. § 101. The Supreme Court has interpreted § 101 as containing "an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014). *Alice* sets forth a two-step inquiry for adjudicating patent eligibility under § 101. A court must first (1) "determine whether the claims at issue are directed to" a "patent-ineligible concept[]." *Id.* at 2355. If so, the court must then (2) "determine whether [any] additional elements 'transform the nature of the claim' into a patent-eligible application . . . [presenting an] 'inventive concept.'" *Id.* Determinations of ineligibility under Section 101 can be made on the basis of representative claims of the patents at issue. *See Content Extraction*, 776 F.3d at 1348.

To determine whether a claim is directed to an abstract idea, the court "distills the gist of the claim" at a "'reasonably high level of generality.'" *Open Text SA v. Box, Inc.*, 78 F. Supp. 3d 1043, 1046-47 (N.D. Cal. 2015) (citation omitted). Applying *Alice*, the Federal Circuit has held that "gathering and combining data" is "an ineligible abstract process," as is "taking existing information . . . and organizing this information into a new form." *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014). The Court has further explained that, where "humans have always performed . . . [claimed] functions," a court will likely conclude that these functions represent abstract concepts. *Content Extraction*, 776 F.3d at 1347.

After finding an abstract idea, the court must search for an "inventive concept" in which "an element or combination of elements . . . amounts to *significantly more* than a patent upon the [ineligible concept] itself." *Alice*, 134 S. Ct. at 2355 (emphasis added). If the claims merely add "conventional" activity or recitations "limiting the use of an abstract idea to a particular technological

environment," then that is insufficient.  *Alice*, 134 S. Ct. at 2357-59 (internal quotations omitted).

Taking an otherwise ineligible abstract idea and merely adding "'well-understood, routine,

conventional activit[ies]' previously known to the industry" is also not enough.  *Id.* at 2359 (quoting

*Mayo Collaborative Servs. v. Prometheus Laboratories, Inc.*, 132 S.Ct. 1289, 1294 (2012)).  Courts

have repeatedly held that simply applying an abstract idea on a generic computer or limiting the idea

to a particular field of use or technological environment provides no inventive concept.  *See, e.g.*,

*Alice*, 134 S. Ct. at 2357-59; *Content Extraction*, 776 F.3d at 1348; *Ultramercial, Inc. v. Hulu, LLC*,

772 F.3d 709, 716 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 2907 (2015).

**2.      Judgment On The Pleadings Should Be Granted When the Plaintiff Asserts Ineligible Patent Claims**

Judgment on the pleadings should be granted under Fed. R. Civ. P. 12(c) when, "accepting all

factual allegations in the complaint as true . . . there is no issue of material fact in dispute, and the

moving party is entitled to judgment as a matter of law."  *Chavez v. United States*, 683 F.3d 1102,

1108 (9th Cir. 2012).  Because patent-eligibility "is an issue of law," *In re BRCA1- & BRCA2-Based*

*Hereditary Cancer Test Patent Litig.*, 774 F.3d 755, 759 (Fed. Cir. 2014), a lawsuit alleging patent

infringement should be dismissed if the patents-in-suit are ineligible.  *See, e.g.*, *OIP Techs., Inc. v.*

*Amazon.com, Inc.*, 788 F.3d 1359, 1360 (Fed. Cir. 2015) (judgment on the pleadings); *buySAFE, Inc.*

*v. Google, Inc.*, 765 F.3d 1350, 1352 (Fed. Cir. 2014) (same); *Shortridge v. Found. Constr. Payroll*

*Serv., LLC*, 2015 WL 1739256, at *1 (N.D. Cal. Apr. 14, 2015) (same).

"Addressing 35 U.S.C. § 101 at the outset [of a case] not only conserves scarce judicial

resources and spares litigants the staggering costs associated with discovery and protracted claim

construction litigation, it also works to stem the tide of vexatious suits brought by owners of vague

and overbroad" patents.  *OIP Techs.*, 788 F.3d at 1364.  That is especially so here, where the same

patents have been asserted in both the U.S. District Court and the U.S. International Trade

Commission, and the Court's decision here can simultaneously dispose of issues in both forums.  *See*

*SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 370 (Fed. Cir. 1983) (holding that

district court decision invalidating patents properly modified the scope of the Commission's

exclusion order).

**B.      JUDGMENT ON THE PLEADINGS SHOULD BE GRANTED BECAUSE JAWBONE'S ASSERTED PATENTS ARE INELIGIBLE UNDER SECTION 101**

The claims of the '546, '275, and '522 patents are directed to the abstract ideas of: (1) providing weight loss suggestions, based on an individual's activity levels; (2) collecting information to provide feedback to a user in the form of health "scores" and "target scores" (but without any specific formula for doing so); and (3) conserving battery usage during shipment by deactivating functionality until the device can be plugged into an external power source.  These are all activities that have historically been performed by human beings without the need for a computer, much less a wearable computing device.  The patent claims are also ineligible as they only apply their abstract ideas to preexisting computing systems with preexisting sensor and processing technology.

**1.      The '546 Patent**

**a.      The '546 Patent is Directed to the Abstract Concept of Making Weight-Loss Suggestions Based On A User's Activity**

The '546 patent merely implements on a computer what human beings have done for a long time.  As the '546 patent admits, the invention reflects a calorie-measuring fitness concept that has been employed for decades in various well-known health and diet programs, such as Weight Watchers and Jenny Craig.  (Ex. 1 at 2:1-48.)  These programs are designed to do exactly what the '546 patent purports to do:  provide suggestions to aid in achieving a person's weight-loss goals, and then, based on that person's compliance with those suggestions, provide further suggestions.  As the '546 patent observes regarding Jenny Craig:  "Typically, an individual is assigned a personal consultant who monitors weight loss progress.  In addition, the individual will receive pre-selected menus . . . ."  (*Id.* at 2:36-39.)

The '546 patent's criticism of these pre-existing, low-tech programs centers not on what they do, but rather on how effective they can be in achieving their goals.  For example, Jenny Craig "does not teach new eating habits or the value of exercise.  Instead it focuses mainly on short-term weight loss goals." (*Id.* at 2:45-48.)  In addition, these existing programs are "highly dependent upon compliance with rigorous data entry requirements."  (*Id.* at 4:5-7.)  According to the '546 specification, "[w]hat is lacking in the art is a management system that can accurately and automatically monitor daily activity and energy expenditure of the user to reduce the need for strict

compliance with and the repetitive nature of manual data entry of information." (*Id.* at 4:7-11.)  In other words, the '546 patent is directed to doing what age-old nutrition plans have been doing for decades, but doing it on a computer – in this case, a wearable wrist-band computer.

The '546 patent supposedly addresses the need in the art by using a wearable device to collect data automatically from a user – rather than require "manual data entry" from that user – but that does not transform the basic concept underlying the nutrition and activity system into anything less abstract.  The use of a wearable fitness tracker simply makes it easier and more convenient to keep track of the data, by using well-known technology (preexisting sensors and processors) to do so.  Again, it bears repeating that the claimed invention of the '546 patent does not lie in the details of motion sensor technology, heart-rate sensor technology, or computing technology that form the "guts" of the wearable fitness tracker – rather, the purported "invention" rests on the use of these preexisting technologies to make a weight-loss suggestion system easier and more efficient.  In that vein, an equally abstract "invention" would be the use of well-known email systems to communicate weight-loss suggestions to program participants, rather than relying on the U.S. Postal Service or carrier pigeon.  Even if the use of a wearable computing device enhances the implementation of an abstract idea by performing it with increased accuracy or greater efficiency, it does not have the transformative effect necessary to confer eligibility. *See Wolf v. Capstone Photography, Inc.*, 2014 WL 7639820, at *13 (C.D. Cal. Oct. 28, 2014) ("That generic computer technology allows for a more efficient process does not confer patent eligibility."); *see also Thales Visionix, Inc. v. U.S.*, 122 Fed. Cl. 245, 252-54 (Fed. Cl. 2015) (use of well-known sensor technology and computers does not confer patent eligibility).

The "pen and paper test" further confirms that the '546 patent is drawn to an abstract idea because it can be accomplished without the claimed technology. *See OpenTV, Inc. v. Apple, Inc.*, No. 14-cv-01622-HSG, 2015 WL 1535328, at *4 (explaining the pen-and-paper test "does not require described electronic components to literally exist on paper: instead it is an analytical tool to test whether the underlying concept described in the claims is abstract.").  A claim whose steps "can be performed in the human mind, or by a human using a pen and paper" is typically directed to an abstract idea. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011).

The '546 patent explicitly describes how comparable existing programs tracked energy expenditure "through *manual input* of the user," rather than using an apparatus to track the information, as described in the '546 patent. (Ex. 1 at 4:35-43.) The existing art includes systems in which individuals track and budget points or actual caloric values, follow pre-set menus or advice from a consultant, and manually log activities, meals, body measurements, and even daily emotions—all of which are tasks that can be performed by human minds and by using pen and paper. Likewise, the system of the '546 patent gathers and tracks a user's data and suggests steps to achieve a weight loss goal based on the user's progress, something that can also be performed manually or in the human mind. The invention is distinguished only by the use of a wearable computing device that will do the tracking for the user.

The remaining asserted claims of the '546 patent—all dependent on claim 1—also fail the first prong of the *Alice* inquiry. These claims include limitations that involve: deriving and using an "energy balance" (*i.e.*, caloric intake vs. expenditure); identifying patterns in the user data to represent current and potential performance; storing data in databases; data output (*e.g.*, creating reports); health modification planning (*i.e.*, suggesting steps toward health goal); and processing unit or system configuration (*i.e.*, configuring a generic computing unit to create derived data). (*Id.* at 60:39-62:25 (Claims 2-18, 20-28)). These elements are non-inventive mechanisms that accomplish the basic functionalities described in the representative claim. For each, all that is claimed is the general idea, and not any specific technology to accomplish these goals. While these limitations "add a degree of particularity, the concept embodied by the majority of the limitations describes only the abstract idea" of tracking and deriving user data to provide feedback directed to achieving the user's weight-loss goal. *Ultramercial*, 772 F.3d at 715.

### b.     Using a Conventional Computing Apparatus to Execute the Abstract Steps of a Weight Loss Program Does Not Add an Inventive Concept

Tailoring a weight-loss program to an individual's activity levels and diet is an "undisputedly well-known" function. *Content Extraction*, 776 F.3d at 1347. Applying this abstract concept to an apparatus comprising preexisting technology performing conventional functions – specifically, (1) sensors measuring physiological and/or contextual parameters (such as motion, temperature, and

heart rate) and (2) a processing unit running software to generate derivations of such parameters (such as calories burned and activity levels) and to suggest adjustments (such as increasing the amount of exercise or decreasing the amount of calories consumed) – does not confer patent-eligible status. *See Alice*, 134 S. Ct. at 2360 (explaining how system claims invoking a "'data processing system' with a 'communications controller' and 'data storage unit'" are "purely functional and generic" components for "performing the basic calculation, storage, and transmission functions required by the method claims").

In *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, the asserted method claim involved the combination and organization of two digital imaging data sets generated from existing information. 758 F.3d at 1351. The court held that "a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible." *Id.* Embodiments of the '546 patent involve a highly similar process: applying equations to sensor data (*e.g.*, accelerometer data used to measure steps walked) in order to calculate a more specific weight-loss target (*e.g.*, number of calories burned), as well as generate status reports with suggested activities. The fact that this process is accomplished by a standard computing unit does not render the claimed system "inventive."

Because the '546 patent claims the abstract idea of providing weight-loss suggestions, and because this is accomplished using well-known sensors on a wearable computing device in a manner that does not amount to "significantly more than a patent upon the [abstract idea] itself," *Alice*, 134 S. Ct. at 2355, the '546 patent fails both prongs of the *Alice* test for eligibility.

## 2.       The '275 Patent

### a.       The '275 Patent is Directed to the Abstract Concept of Collecting Data to Calculate and Present Health "Scores" To a User

Aggregating various health-related data for a person to calculate an overall "score" – and presenting that "score" to the person as feedback, as claimed in the '275 patent – is a basic and abstract concept. In the realm of healthcare and wellness specifically, a wide array of health-related "scores" have been used for decades, including: cholesterol scores, blood pressure readings, resting heart rate, VO2 max, red and white blood cell counts, and platelet counts. Similarly, a variety of

inputs have been used in the past to create health risk assessments (HRAs) for individuals, which takes into consideration not only physiological data, but also family medical histories, lifestyle, and demographic characteristics to calculate a risk assessment or overall health "score."[3]

Of course, the foregoing examples are purely illustrative, as the concept itself is as basic, old, and abstract as the concept, in a completely different context, of aggregating on-base percentage data (OBP) and slugging percentage data to calculate a baseball player's overall prowess as a hitter: *i.e.*, on-base-plus-slugging (OPS).  Using computers and calculators to aggregate and track this statistical information certainly makes the process more efficient and convenient, but no less abstract.  Indeed, in the '275 patent, the specification itself sets forth a supremely simple example of score calculation that can be performed in the head, even without the aid of pen and paper:

> For example, a user may set as its goal to consume 45 milligrams of vitamin C per day . . . .  At breakfast, the user consumes a meal and receives about 22 milligrams. A profile includes data that equates 45 milligrams as 20 points (*i.e.*, a target score for this nutrient).  In this case, 20 points is a reference value (*i.e.*, the baseline parameter). As 22 milligrams, which represents an acquired parameter (*e.g.*, units of 22 mg, and type of: vitamin C nutrient), is approximately half of the goal, the user receives 10 points as the value.

(Ex. 2 at 44:6-21.)  In short, just as the '546 patent above purports to patent an abstract concept that can be performed in the human mind, as well as on pen and paper, so, too, does the alleged invention of the '275 patent.

On their face, the '275 patent claims reflect a collection of routine, conventional steps that accomplish the abstract result of collecting various data inputs – obtained from an accelerometer or other sensors – to be presented in the form of health "scores."  In particular, the broad method described in claim 1 cannot rise above an abstraction because it "contains no restriction on how the result is accomplished."  *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015).  The method claim merely recites the intangible steps of "receiving," "acquiring," and "determining" activity data and "calculating," "present[ing]," and "adjusting" scores reflecting progress toward a target without specifically describing the mechanisms for any of these steps.  *See*

---

[3]  *See, e.g.*, R. Goetzel *et al.*, "A Framework for Patient-Centered Health Risk Assessments," U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, Atlanta, GA, 2011. Available at: http://www.cdc.gov/policy/opth/hra/.

*Ultramercial*, 772 F.3d at 715; *OpenTV*, 2015 WL 1535328, at *3. As noted above, no specific formulas or algorithms are disclosed or claimed in any part of the '275 patent. As a consequence, the descriptions of these steps lack the "particular concrete or tangible form" required of patent-eligible subject matter. *Ultramercial*, 772 F.3d at 715.

The remainder of the asserted claims are dependent method claims that do little more than add a degree of specificity to the types of data analyzed (*e.g.*, sleep, nutrition, movement), the types of scores generated (*i.e.*, describing different bases for the calculated and adjusted scores), and the ways to present the information (*e.g.*, representing an activity recommendation, graphical representations), and therefore do not reflect substantially more than the underlying abstract idea. *See Alice*, 134 S. Ct. at 2357.

> **b.   Using Generic Computing Functionality to Aggregate Health Data and to Generate and Modify Scores Does Not Add an Inventive Concept**

As with the '546 patent, the claims of the '275 patent contain no inventive concept because their elements, considered individually or in an ordered combination, do not amount to "significantly more than a patent upon the [abstract idea] itself." *Id.* at 2355. For example, device claim 19 comprises an interface with sensors, a status display, and a computing unit that stores data, houses processors, and runs scoring software. (Ex. 2 at 49:13-50:20). As noted above, the technological elements listed in the claim – such as the "aggregation engine," "score generator," or "status manager" – have vague and generic descriptions that do not suggest inventive concepts in and of themselves. *See Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1370 (Fed. Cir. 2015) (discussing how "interactive interface" is a simple description for a generic web server). The "aggregation engine" is the unit that contains the device's processors and data storage; the "score generator" is simply the software that calculates the scores (by the use of formulas and other manipulations that are not disclosed in the patent); and the "status manager" is composed of two preexisting pieces of hardware – a vibrating alert mechanism and score display. The listed compu-ting components do not constitute, individually or collectively, the claimed invention itself, but instead serve as conventional means to carry out the abstract tasks discussed above. As the Supreme

Court made clear in *Alice*, a patented device's collection of generic, preexisting components does not present the inventive concept necessary to render it eligible subject matter. *Alice*, 134 S. Ct. at 2358.

Even if the computerization of these elements – which could be carried out by a human rather than a machine – allows for an enhanced or more efficient process, that implementation is insufficient to transform the concept into eligible subject matter. *See Intellectual Ventures I LLC*, 792 F.3d at 1370 ("[O]ur precedent is clear that merely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility on an otherwise abstract idea."); *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1007 (Fed. Cir. 2014) (affirming the district court's holding that using a computer in connection with an abstract idea to manage a process more efficiently does not impart patent eligibility). The '275 patent allegedly improves upon existing art by addressing purported inefficiencies, design issues, and expenses in connection with comprehensive data collection for multiple activities. (Ex. 2 at 9:57-10:56.) However, merely adding "'well-understood, routine, conventional activit[ies]' previously known to the industry," such as running software on a wearable computer using well-known sensors, will not render an abstract idea eligible. *Alice*, 134 S. Ct. at 2359 (quoting *Mayo*, 132 S. Ct. at 1294).

The '275 patent is not patent eligible because it reflects the abstract idea of assigning a "score" to a person's health status and comparing it with an aggregate "target score," and this concept is merely applied on a generic computing device with preexisting sensor technology, without "effect[ing] an improvement in any other technology or technical field." *Id.* at 2359. As a result, the claims of the '275 patent should be dismissed.

    **3.**    **The '522 Patent**

        **a.**    **The '522 Patent Is Directed To The Abstract Concept Of Conserving Battery Power By Turning Off Device Functionality Until a Continuous Power Source Is Available**

Conserving battery power within a portable electronic device by using two power modes—power off and power on—is a fundamental aspect of using battery power. This is the rudimentary operation that forms the entire invention of the '522 patent. Claim 2 is directed to the abstract idea of using low (or no) power during an initial period of inactivity – *i.e.*, during shipment – and switching to an active power mode when receiving a signal.

Batteries were developed as a practical source of electricity in the 1800s and have been widely used in innumerable applications for more than 200 years – from telegraphs and data centers to small, portable devices.[4]  Because batteries store finite amounts of power, managing the consumption of that power has been an important concern since long before the computer age. Indeed, turning off the power to conserve battery life prior to the purchase of a battery-operated product by the consumer is a business practice that has been in use since long before computer batteries.  For example, to save its battery, an analog watch may have its crown pulled out of the base until its first use, at which point the new owner pushes the crown into place to activate the watch. The claims of the '522 patent cover this "undisputedly well-known" abstract concept of switching a battery-operated device that is turned off to turning it on after receiving a signal, which is a function that "humans have always performed" since batteries came into existence hundreds of years ago. *Content Extraction*, 776 F.3d at 1347.

The limitation concerning the relationship between geographic locations and the claimed device's operable state adds no more than an obvious "degree of particularity," which does not make the ineligible concept of power management less abstract.  *See Alice*, 134 S. Ct. at 2357.  The asserted claim describes an inactive mode for the period of time that the device is transported from a first location (such as when shipped from a manufacturer) to a second location (such as a retailer) and a switch to an active mode at the second location where power is applied to the band and its battery to activate certain sensors in the band.  Adding these contextual conditions to the claim, however, does not allow it to rise above the level of abstraction.  In *Intellectual Ventures I LLC v. Capital One Bank*, the Federal Circuit held that activating certain web content based on the time of day during which it was accessed was an "abstract, overly broad concept."  792 F.3d at 1370.

Activating certain power modes according to a basic environmental factor such as geographic location is similarly abstract.  Moreover, the change in power mode claimed in the patent is not even activated by the change in geographic location itself, but rather by the change in power connectivity

---

[4]  *See, e.g.*, *History of Technology*, ELECTROPAEDIA, available at http://www.mpoweruk.com/history.htm.

Gibson, Dunn &
Crutcher LLP

1    that coincides with the change in location – *i.e.*, by the fact that the device is plugged in.  As

2    described in the specification, there may be no power drawn during the initial period of inactivity

3    while the product is in transit (Ex. 3 at 23:5-11), but the power mode will switch in response to the

4    application of power from a continuous power source (*id.* at 22:52-57).

> **b.     Using Generic Computing Components to Conserve Battery Power Does Not Add an Inventive Concept**

7         While the specification and diagrams of the '522 patent describe a specific wearable band that

8    can perform a variety of functions, the claims themselves claim only preexisting computing

9    components—sensors, a battery, a connector, and a processor running software—which make up a

10   conventional battery-operated computing device.  In other words, all of the "technological"

11   components recited in the claims merely add up to a conventional device that performs the abstract

12   concept of saving battery power.

13        Claim 2, like each of the other claims of the '522 patent, contains no specific limitations as to

14   how the signals received by the device are to be interpreted and result in the change in power modes.

15   Indeed, there are no technical improvements described—just the idea that the device could receive an

16   "application of power," which would then signal, in some undisclosed manner, a change in power

17   modes.  The patent does not specify anything about the "controller" other than that it is a generic, off-

18   the-shelf controller.  Without improvements to the incorporated technology that transforms the way

19   in which that technology itself operates, there is no patent-eligible improvement.  *See DDR Holdings,*

20   *LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258-59 (Fed. Cir. 2014) (requiring a claimed solution to

21   resolve a particular problem specifically arising in a technological field that is not a routine or

22   conventional use of technology in the field); *OpenTV*, 2015 WL 1535328, at *5 (explaining that a

23   patented solution must be "directly tied to a specific technological challenge."); *Shortridge*, 2015 WL

24   1739256 at *12 (finding patent claims invalid because the patent owner did not "identify any way in

25   which the claims purport to improve the functioning of the computer itself [or] effect an improvement

26   in any other technology or technical field" (citation omitted)).

27        The '522 patent covers the abstract concept of saving a device's battery consumption by

28   switching off its functionality while it is being shipped.  Applying the abstract idea of power

1 | management to an electronic device comprising conventional components, without more, is simply

2 | not a patentable invention.

3 |                                    **IV.    CONCLUSION**

4 |        Because the claims of the '546, '275, and '522 patents are ineligible under § 101, Fitbit

5 | respectfully requests that the Court grant judgment on the pleadings in Fitbit's favor and dismiss

6 | Counts 1, 3, and 5 of Jawbone's First Amended Complaint.

7 | Dated: October 9, 2015

8 |                                             Respectfully submitted,

9 |                                             GIBSON, DUNN & CRUTCHER LLP

10 |

11 |                                             By:   */s/Frederick S. Chung*                        

12 |                                             JOSH KREVITT, SBN 208552

13 |                                             *JKrevitt@gibsondunn.com*
                                                GIBSON, DUNN & CRUTCHER LLP
14 |                                             200 Park Avenue
                                                New York, NY 10166
15 |                                             Telephone: 212.351.4000
                                                Facsimile: 212.351.4035

16 |                                             WAYNE M. BARSKY, SBN 116731

17 |                                             *WBarsky@gibsondunn.com*
                                                GIBSON, DUNN & CRUTCHER LLP
18 |                                             2029 Century Park East, #4000
                                                Los Angeles, CA 90067
19 |                                             Telephone: 310.552.8500
                                                Facsimile: 310.551.8741

20 |                                             FREDERICK S. CHUNG, SBN 183337

21 |                                             *FChung@gibsondunn.com*
                                                STUART M. ROSENBERG, SBN 239926
22 |                                             *SRosenberg@gibsondunn.com*
                                                ALISON WATKINS, SBN 253023
23 |                                             *AWatkins@gibsondunn.com*
                                                QUINCY LU, SBN 267249
24 |                                             *QLu@gibsondunn.com*
                                                GIBSON, DUNN & CRUTCHER LLP
25 |                                             1881 Page Mill Road
                                                Palo Alto, CA  94304-1211
26 |                                             Telephone: 650.849.5300
                                                Facsimile: 650.849.5333

27 |                                             Attorneys for Defendant

28 |                                             FITBIT, INC.

# CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2015, I caused to be electronically filed the foregoing Defendant Fitbit, Inc.'s Notice Of Motion and Motion For Judgment On The Pleadings Pursuant To Fed. R. Civ. P. 12(C) and supporting papers with the Clerk of the Court via CM/ECF. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing systems.


Dated:     October 9, 2015                    By:   _/s/ Frederick S. Chung_
                                                    Frederick S. Chung